**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number: 2019-NMSC-011**

**Filing Date: May 23, 2019**

**NO. S-1-SC-36060**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**JASON COMITZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Cristina Jaramillo, District Judge**

Released for Publication July 2, 2019

Bennett J. Baur, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
M. Victoria Wilson, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**VIGIL, Justice.**

**{1}**     Defendant Jason Comitz appeals from his convictions of first-degree felony murder (by shooting at a dwelling) and second-degree murder for the death of the same person, four counts of aggravated battery of two other victims, two counts of aggravated assault of the same two victims, two counts of conspiracy to commit aggravated battery of the same two victims, and one count each of conspiracy to commit aggravated assault, shooting at a dwelling, conspiracy to shoot at the same dwelling, and child abuse. We discuss (1) whether the State's evidence was sufficient to prove the crime of

shooting at a dwelling and conspiracy to shoot at a dwelling, (2) whether multiple convictions violate Defendant's right under the United States Constitution to be free from double jeopardy, and (3) whether the district court erred in failing to declare a mistrial on grounds that the State allegedly elicited bad-act evidence in violation of its pretrial ruling. We affirm in part and reverse in part.

## I.   BACKGROUND

**{2}**   On January 28, 2015, Defendant went to the home of his friend Paul Randy Rael (Randy) to pick up $30 that Randy owed him for drugs. When Defendant arrived at the Raels' home, he came into contact with Randy's stepson, Manuel Ramirez (Manuel)—who was just getting home—in front of the house. They argued about the $30 Defendant claimed Randy owed him, which escalated into a fist fight after Manuel saw Defendant reaching for what looked to him like a gun. Manuel punched Defendant multiple times and knocked him to the ground. Randy, his wife Sita Rael (Sita), and their sons Paul Rael Junior (Paul) and Andrew Rael intervened and stopped the fight. Defendant collected the belongings that he had dropped during the fight and left. As Defendant drove off, he held his fingers like a gun and made a shooting gesture at the family.

**{3}**   Four days later, on February 1, 2015, Defendant and two companions, each armed with a hand gun, returned to the Raels' home. Defendant parked his truck across the street from the house, and the three men jumped out of Defendant's truck and started toward the Raels' home. Randy, Sita, Manuel, Paul, and Paul's ten-year-old daughter were at the house.

**{4}**   Paul saw that Defendant and his companions were walking toward the front door, that Defendant had an angry look on his face, and that Defendant was "fidgeting" with something that appeared to be metal. Paul alerted Manuel that Defendant was outside. Paul and Manuel also alerted Sita that Defendant was outside and told Paul's daughter to go into Sita's bedroom.

**{5}**   From the sidewalk in front of the Raels' home, Defendant began calling for Manuel to come outside. Paul and Manuel came out and stood in the doorway on the porch steps in front of the house, with Randy standing next to Paul and Manuel.

**{6}**   While in their respective positions, the two groups argued and exchanged insults. During the argument, Manuel called Defendant a "bitch" for showing up with two men to try to hurt his family. Defendant and his companions responded by drawing their pistols and pointing them at the Raels. One of Defendant's companions moved forward onto the Raels' porch and hit Paul on the head with the handle of his pistol, causing the gun to fire and shoot Paul. This prompted Manuel to reach for his shotgun, which was located inside the front door of the house, whereupon Defendant and his companions started shooting at the Raels. Manuel fired a single shotgun round at Defendant and his companions.

**{7}** After Manuel fired the shotgun, Defendant and his companions stopped shooting and "disappeared." Manuel testified that he fired the shotgun at Defendant and his companions after they started firing at him and his family. Defendant testified in his own defense and acknowledged that he and his companions shot at the Raels but insisted that it was only after Manuel shot at them first.

**{8}** As a result of the gunfight, Randy was shot in the neck and died from his injuries. Paul was shot in the head and lived. Manuel was shot in the leg and lived. Sita and Paul's daughter were unharmed. The ballistic evidence presented at trial indicated that the bullet that killed Randy was not fired from Defendant's gun.

**{9}** The State charged Defendant with committing twenty offenses, together with enhancements, in an eleven-count indictment as follows:

- Count 1, first-degree murder (willful and deliberate) of Randy or the lesser included offenses of second-degree murder (firearm enhancement) or voluntary manslaughter (firearm enhancement), or alternatively, felony murder,

- Count 2, conspiracy to commit first-degree murder, or alternatively, to commit felony murder,

- Count 3, attempt to commit first-degree murder of Paul (willful and deliberate) (firearm enhancement), or alternatively, either aggravated battery (great bodily harm) (firearm enhancement) or aggravated battery (deadly weapon) (firearm enhancement),

- Count 4, attempt to commit first-degree murder of Manuel (willful and deliberate) (firearm enhancement), or alternatively, either aggravated battery (great bodily harm) (firearm enhancement) or aggravated battery (deadly weapon) (firearm enhancement),

- Count 5, conspiracy to commit aggravated battery (great bodily harm), or alternatively, conspiracy to commit aggravated battery (deadly weapon),

- Count 6, aggravated assault (deadly weapon) (firearm enhancement) of Paul,

- Count 7, aggravated assault (deadly weapon) (firearm enhancement) of Manuel,

- Count 8, conspiracy to commit aggravated assault (deadly weapon),

- Count 9, child abuse (no death or great bodily harm) (firearm enhancement),

- Count 10, shooting at a dwelling or occupied building resulting in injury, and

- Count 11, conspiracy to commit shooting at a dwelling or occupied building.

{10}    Defendant claimed self-defense. The jury rejected the claim and returned guilty verdicts for first-degree felony murder and second-degree murder of Randy, four counts of aggravated battery of Paul and Manuel, two counts of aggravated assault of Paul and Manuel, one count of conspiracy to commit aggravated assault, two counts of conspiracy to commit aggravated battery, one count of child abuse, one count of conspiracy to shoot at a dwelling or occupied building, and one count of shooting at a dwelling or occupied building. The district court sentenced Defendant to a term of life imprisonment for the felony-murder conviction and additional terms of incarceration for the remaining convictions and associated firearm enhancements.

{11}    Defendant appeals directly to this Court. N.M. Const. art VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court."); Rule 12-102(A)(1) NMRA.

## II.    DISCUSSION

## A.    Defendant's Felony-Murder Conviction

{12}    First-degree murder in New Mexico includes murder committed "in the commission of or attempt to commit any felony[.]" NMSA 1978, § 30-2-1(A)(2) (1994). This is commonly referred to as felony murder. *State v. Frazier*, 2007-NMSC-032, ¶ 22, 142 N.M. 120, 164 P.3d 1. Notwithstanding the broad statutory language, we have repeatedly stated that, owing to legislative intent, there are many limitations to this crime. *See State v. Marquez*, 2016-NMSC-025, ¶ 14, 376 P.3d 815 (listing cases that have limited the scope of the felony-murder rule). One such limitation is "the collateral-felony rule." *Id.* Under the collateral-felony rule, the predicate felony must "be independent of or collateral to the homicide." *Id.* (internal quotation marks and citation omitted).

{13}    Challenging his felony-murder conviction, Defendant argues that shooting at a dwelling or occupied building, as defined in NMSA 1978, Section 30-3-8(A) (1993), cannot serve as a predicate felony for felony murder. Defendant relies on this Court's rationale in *Marquez*, 2016-NMSC-025, ¶¶ 23-25, in which we held that the offense of shooting at or from a motor vehicle as defined in Section 30-3-8(B) cannot serve as the predicate felony for a felony-murder conviction because "shooting at or from a motor vehicle is an elevated form of aggravated battery" and does not have a felonious purpose independent from the purpose of injuring the victim. *Marquez*, 2016-NMSC-025, ¶ 23 (internal quotation marks and citation omitted). Defendant asserts that, likewise, the crime of shooting at a dwelling does not have a felonious purpose independent from the purpose of injuring another. He argues that, under the collateral-

felony limitation, shooting at a dwelling cannot serve as a predicate felony for felony murder. *See State v. O'Kelly*, 2004-NMCA-013, ¶ 24, 135 N.M. 40, 84 P.3d 88 ("[T]he 'collateral-felony' limitation dictates that the predicate felony may not be a lesser included offense of second degree murder." (citation omitted)). In light of *Marquez*, Defendant also contends that this Court should overrule *State v. Varela*, 1999-NMSC-045, 128 N.M. 454, 993 P.2d 1280. In *Varela* we held that shooting at a dwelling is not a lesser included offense of second-degree murder under a strict elements test and therefore that the collateral-felony limitation does not preclude shooting at a dwelling as a predicate felony to felony murder. *See id.* ¶¶ 18, 20-21.

**{14}** The State responds that shooting at a dwelling is a proper predicate for Defendant's felony-murder conviction. Specifically, the State argues that a determination that shooting at a dwelling or occupied building may serve as the predicate felony for felony murder is consistent with the *Marquez* "felonious purpose" analysis under the collateral felony doctrine and does not require overruling *Varela*.

**{15}** However, a felony-murder conviction rests upon proof beyond a reasonable doubt that the predicate felony was committed. *See* UJI 14-202 NMRA. A failure of proof is fundamental error. *See State v. Vance*, 2009-NMCA-024, ¶ 6, 145 N.M. 706, 204 P.3d 31 ("'If the evidence is insufficient to legally sustain one of the elements of a crime, the error is fundamental.'" (alteration omitted) (citation omitted)). We may review an issue of the sufficiency of the evidence on appeal even if the issue is not argued by the parties. *See State v. Doe*, 1978-NMSC-072, ¶ 4, 92 N.M. 100, 583 P.2d 464. Based on our review of the facts of this case, we conclude that a significant issue exists as to whether the State proved the essential elements of the predicate felony used to obtain Defendant's felony-murder conviction—shooting at a dwelling. Therefore, on our own motion, we consider whether sufficient evidence supports Defendant's conviction for shooting at a dwelling. We also consider whether the evidence supports Defendant's conviction for conspiring to commit shooting at a dwelling.

**{16}** "In reviewing the sufficiency of the evidence, 'the reviewing court views the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict.'" *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 (alterations omitted) (citation omitted). "'The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction.'" *Id.* (citation omitted). "'Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.'" *Id.* ¶ 53 (alteration omitted) (citation omitted). "We do 'not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence,' and we do 'not weigh the evidence or substitute our judgment for that of the fact finder so long as there is sufficient evidence to support the verdict.'" *Id.* ¶ 52 (alterations omitted) (citation omitted); *see also State v. Torrez*, 2013-NMSC-034, ¶ 40, 305 P.3d 944 (discussing the standard of review for sufficiency of the evidence).

**{17}** The jury was instructed that in order to find Defendant guilty of felony murder, the State was required to prove beyond a reasonable doubt, in pertinent part, that "[D]efendant committed the crime of Shooting at a Dwelling resulting in great bodily harm under circumstances or in a manner dangerous to human life" and "caused the death of [Randy] during the commission of Shooting at a Dwelling resulting in great bodily harm." The crime of shooting at a dwelling or occupied building is substantively defined as "willfully discharging a firearm at a dwelling or occupied building." Section 30-3-8(A). Consistent with Section 30-3-8(A), the elements instruction given to the jury required the State to prove beyond a reasonable doubt that "[D]efendant willfully shot a firearm at a dwelling."

**{18}** Viewing the evidence in the light most favorable to the guilty verdict and indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict, we conclude that the State failed to prove that Defendant committed the felony of shooting at a dwelling. No evidence supports a finding that when Defendant fired his pistol he willfully shot *at* the Raels' home as required both by Section 30-3-8(A) and by the elements instruction to the jury for shooting at a dwelling. *See Webster's Third New International Dictionary* 136 (3d ed. 1993) (defining "at" as "a function word to indicate that which is the goal of an action or that toward which an action or motion is directed"); *see also Fleming v. Commonwealth*, 412 S.E.2d 180, 183-84 (Va. Ct. App. 1991) (stating that the word "at," for purposes of a statute prohibiting discharge of a firearm at an occupied dwelling, is defined as "a function word used to indicate that toward which an action is directed" (alterations omitted) (internal quotation marks and citation omitted)). Instead, the only reasonable inference from the evidence is that Defendant and his companions specifically and primarily targeted the Raels themselves in the course of a gunfight that took place in front of the dwelling. In other words, the evidence was that the goal of Defendant and his companions was to shoot *at* the Raels, not *at* the house. The fact that the Raels were standing in front of the house during the gunfight did not shift Defendant's target from the Raels to the house.

**{19}** The facts of this case stand in stark contrast to other cases in which we have upheld convictions, based on challenges to the sufficiency of the evidence, for shooting at a dwelling or occupied building in violation of Section 30-3-8(A). In those cases, the facts clearly support a finding that the target of the defendants' gunfire was the dwelling or occupied building itself. In *Torrez*, following an altercation at a party, the defendant left the house, armed himself, and then returned to the house. *See* 2013-NMSC-034, ¶¶ 2-4. From the street, the defendant took out his firearm and fired at the house. *See id.* ¶¶ 3-4. There was no evidence presented that the defendant was aiming at any particular individual during his assault. *See id.* ¶¶ 2-4, 42-43 ("[S]everal witnesses . . . testified that when [the d]efendant returned to the house where the party was taking place, he opened fire on the house without anyone else firing back at him." *Id.* ¶ 42.). As a result of the defendant's indiscriminate gunfire, one partygoer was injured and another was killed. *See id.* ¶ 4. Under these facts, we concluded that there was sufficient evidence to support the defendant's conviction of felony murder based on the predicate felony of shooting at a dwelling. *See id.* ¶¶ 41-42.

**{20}**     Similarly, in *State v. Arrendondo*, we affirmed the defendant's conviction of shooting at a dwelling, noting three pieces of evidence upon which the jury could have relied to reasonably infer that the defendant intentionally shot into the house. *See* 2012-NMSC-013, ¶¶ 36-37, 278 P.3d 517. First, there was evidence that the defendant "was expressing hostility towards" an occupant of the house who was not the ultimate and intended murder victim. *Id.* ¶ 37. Second, there was "evidence that at least two bullets entered the house." *Id.* Finally, there was "evidence that the trajectory of the bullets that entered the house was different from the trajectory of the bullets that entered [the victim's] body." *Id.* In reference to the trajectories, there was testimony that "the trajectory of the bullets that landed in the house indicate[d] that the shooter was aiming directly at the house." *Id.* ¶¶ 12, 36.

**{21}**     Finally, in *Varela*, we concluded that the facts supported a conviction of accessory to felony murder by shooting at a dwelling when, just before midnight, one of the defendant's companions fired several shots into a dark mobile home before speeding away. *See* 1999-NMSC-045, ¶¶ 1-2, 7, 9, 21. The companion who admitted to firing the gun testified that the motive behind the attack was to "get even" with a rival gang member whose father owned the mobile home. *See id.* ¶¶ 2, 4, 7. The rival gang member's father was killed when he was struck by one of the fired rounds while asleep in the mobile home. *Id.* ¶¶ 2, 4. We held that this evidence was sufficient to support a conviction of felony murder predicated on shooting at a dwelling. *Id.* ¶¶ 1, 21.

**{22}**     By contrast, the evidence in the instant case is not sufficient to support a conviction of felony murder predicated on the felony of shooting at a dwelling. Unlike the defendants in *Torrez, Arrendondo*, and *Varela*, Defendant and his companions did not target the house in their attack. They did not fire indiscriminately at the house from the street like the defendants in *Torrez* and *Varela*. The objects of Defendant's assault were individual Raels. This is supported by the facts that Defendant's group specifically urged Manuel to come outside the house and that Paul was targeted at close range when one of Defendant's companions moved onto the porch before striking him and shooting him in the head. In contrast to the evidence in *Arrendondo*, there was no bullet trajectory evidence presented at Defendant's trial to show that Defendant's group directly aimed at the house. Absent sufficient evidence that the dwelling was the principal target of Defendant's gunfire, we will not permit Defendant's conviction of second-degree murder to be elevated to a conviction of felony murder simply because the second-degree murder occurred in front of a dwelling.

**{23}**     Because the State failed to prove the felony used as the predicate for Defendant's felony-murder conviction, it follows that Defendant's conviction of felony murder (Count 1 alternative) as well as Defendant's conviction of shooting at a dwelling (Count 10) must be vacated for a failure of proof. Therefore we do not need to address Defendant's argument that his felony-murder conviction must be vacated on grounds that a flaw in the felony-murder jury instruction constituted fundamental error.

**{24}**     In addition, and for largely the same reasons, the State failed to present sufficient evidence that Defendant conspired to shoot at a dwelling or occupied building. The jury

was instructed in pertinent part that in order for it to find Defendant guilty of conspiracy to commit shooting at a dwelling or occupied building, the State was required to prove beyond a reasonable doubt that Defendant "and another person by words or acts agreed together to commit Shooting at a Dwelling" and that Defendant "and the other person intended to commit Shooting at a Dwelling." The evidence presented by the State and the inferences from that evidence fail to prove that Defendant and his companions at any time formed an agreement to shoot *at* the Raels' home or that they intended to shoot *at* the Raels' home. The fact that there was a gunfight in which Defendant and his companions were shooting *at* the Raels does not equate, by itself, to an agreement to shoot *at* the Raels' home. Defendant's conviction of conspiracy to commit shooting at a dwelling or occupied building (Count 11) must also be set aside for a failure of proof.

## B.     Defendant's Double Jeopardy Claims

**{25}**    Defendant argues that several of his convictions violate his right to be free from double jeopardy and must be vacated. The State agrees with Defendant that some convictions violate double jeopardy and must be vacated. However, we are not bound by the State's concession, and we independently assess Defendant's claims. *See State v. Martinez*, 1999-NMSC-018, ¶ 26, 127 N.M. 207, 979 P.2d 718 (stating that the appellate courts are not bound by the State's concession of an issue in a criminal appeal).

**{26}**    "This Court reviews claims involving alleged violations of a defendant's right to be free from double jeopardy de novo." *State v. Loza*, 2018-NMSC-034, ¶ 4, 426 P.3d 34. The Fifth Amendment, made applicable to the states by the Fourteenth Amendment, prohibits double jeopardy and "functions in part to protect a criminal defendant against multiple punishments for the same offense." *State v. Swick*, 2012-NMSC-018, ¶ 10, 279 P.3d 747 (internal quotation marks and citation omitted). There are two classes of double jeopardy multiple-punishment cases: (1) the "double-description case, where the same conduct results in multiple convictions under different statutes," and (2) the "unit-of-prosecution case, where a defendant challenges multiple convictions under the same statute." *Id.* Defendant's arguments raise both double-description and unit-of-prosecution claims, and we proceed to analyze each double jeopardy argument.

## 1.     Defendant's felony-murder and second-degree-murder convictions

**{27}**    Defendant argues that double jeopardy was violated because his felony-murder and second-degree-murder convictions both result from Randy's killing. Because we have concluded that Defendant's felony-murder conviction must be vacated for a failure of proof, Defendant's argument is moot, and Defendant's second-degree-murder conviction stands.

## 2.     Defendant's conviction for shooting at a dwelling

**{28}**   Defendant argues that his conviction for shooting at a dwelling must be vacated on double jeopardy grounds. Again, Defendant's double jeopardy argument is moot because we vacate Defendant's conviction for shooting at a dwelling on the basis of insufficient evidence.

### 3.      Defendant's convictions for the aggravated batteries of Paul and Manuel

**{29}**   Defendant argues that his two convictions for the aggravated battery of Manuel (Count 4) and two convictions for the aggravated battery of Paul (Count 3), where each count was charged in the alternative as aggravated battery with a deadly weapon and aggravated battery resulting in great bodily harm, both result in multiple punishments in violation of his double jeopardy rights. The State concedes that one aggravated battery conviction per victim must be vacated.

**{30}**   In *State v. Cooper*, this Court reviewed whether multiple convictions for a single count of aggravated battery charged under multiple theories of the crime violated double jeopardy. *See* 1997-NMSC-058, ¶ 53, 124 N.M. 277, 949 P.2d 660. We held that the defendant's two convictions for one count of aggravated battery charged under two theories—"battery with a deadly weapon and battery in a manner that could cause great bodily harm"—constituted a violation of double jeopardy. *Id.* Therefore, the Court vacated one of the defendant's aggravated battery convictions. *Id.* ¶¶ 53, 63.

**{31}**   Under the circumstances of this case, *Cooper* is on point. Defendant was charged with two counts of attempt to commit deliberate first-degree murder, relating to the shooting of Manuel and Paul, respectively. Each attempted murder count included as alternatives two aggravated battery charges brought under theories of use of a deadly weapon and resulting in great bodily injury. The jury was further instructed that it could find Defendant guilty of the attempted murder of Manuel and of Paul, or alternatively of the aggravated battery of each. The jury received separate instructions for aggravated battery as to each victim, Manuel and Paul, under both theories: battery with a deadly weapon and battery resulting in great bodily harm. The jury returned four aggravated battery convictions against Defendant—two for the shooting of Manuel under each of the two charged theories and two for the shooting of Paul under each of the two charged theories. Because the indictment and jury instructions reflect that Defendant was charged in Counts 3 and 4 with only one act of battering each of the two victims—Manuel and Paul—under two theories of the crime, we conclude following *Cooper* that one aggravated battery conviction per count must be vacated. *See also State v. Garcia*, 2009-NMCA-107, ¶¶ 9, 16-17, 147 N.M. 150, 217 P.3d 1048 (determining that the defendant's aggravated-battery and simple-battery convictions arising from the same conduct violated his double jeopardy rights).

### 4.      Defendant's conspiracy convictions

**{32}**   Defendant argues that the State failed to establish the existence of distinct conspiracies at trial, and as a result, three of his four conspiracy convictions must be vacated. The State agrees.

**{33}** In *State v. Gallegos*, we concluded that based on "the text, history, and purpose of our conspiracy statute . . . the Legislature established . . . a rebuttable presumption that multiple crimes are the object of only one, overarching, conspiratorial agreement subject to one, severe punishment set at the highest crime conspired to be committed." 2011-NMSC-027, ¶ 55, 149 N.M. 704, 254 P.3d 655. "At trial, the state has an opportunity to overcome the Legislature's presumption of singularity, but doing so requires the state to carry a heavy burden." *Id.*

**{34}** In determining whether the State has overcome the Legislature's presumption of singularity and demonstrated the existence of more than one conspiracy, this Court has adopted a multifactor totality of circumstances test used by federal courts. *Id.* ¶¶ 42, 56. The factors used to determine the number of agreements where more than one conspiracy is alleged include whether the alleged conspiracies (1) have the same location, (2) overlap significantly in time, (3) involve the same or overlapping personnel, (4) involve similar overt acts charged against the defendant, and (5) involve the defendant performing a similar role. *Id.* ¶ 42. "While New Mexico law does not require the existence of an overt act, our courts may still rely on this factor to help determine whether a defendant entered into one or more conspiratorial agreements." *Id.* ¶ 56 n.3.

**{35}** The jury returned four conspiracy convictions against Defendant arising from the shooting: (1) conspiracy to commit aggravated battery (great bodily harm), as charged in Count 5, (2) conspiracy to commit aggravated battery (deadly weapon), charged as an alternate in Count 5, (3) conspiracy to commit aggravated assault (deadly weapon), as charged in Count 8, and (4) conspiracy to commit shooting at a dwelling (great bodily harm), as charged in Count 11. However, because we have already concluded that the evidence fails to prove a conspiracy to shoot at a dwelling, we limit our discussion to the remaining three conspiracy convictions. Applying the totality of circumstances test, we conclude that the evidence at trial established the existence of only one conspiracy. First, the location and time of the alleged conspiracies were the same, and they overlapped temporally. The direct and circumstantial evidence showed that the agreement to shoot at the Rael family was formed between Defendant and his companions while they were on the way to the Raels' home or during the verbal exchange that preceded the exchange of gunfire. *See State v. Trujillo*, 2002-NMSC-005, ¶ 62, 131 N.M. 709, 42 P.3d 814 ("The agreement [necessary to establish conspiracy] may be established by circumstantial evidence."). Second, the personnel involved in the several charged conspiracies, Defendant and his two companions, were the same. Finally, the overt acts and Defendant's role in the several charged conspiracies were the same. Specifically, Defendant's role in the charged conspiracies was to call the Raels outside and shoot at them.

**{36}** Because Defendant's actions were all part of one, overarching conspiratorial agreement, Defendant's multiple conspiracy convictions violate double jeopardy. Because the highest crime conspired to be committed was aggravated battery, this conspiracy conviction is affirmed. *Compare* NMSA 1978, § 30-3-5(C) (1969) ("Whoever commits aggravated battery inflicting great bodily harm or does so with a deadly

weapon . . . is guilty of a third degree felony.") *with* NMSA 1978, § 30-3-2 (1963) ("Whoever commits aggravated assault is guilty of a fourth degree felony.").

## 5.     Defendant's aggravated-battery and aggravated-assault convictions

**{37}**     Defendant argues that his aggravated-assault convictions (Counts 6 and 7) must be vacated on double jeopardy grounds because they are subsumed in his aggravated-battery convictions (Counts 3 and 4). The State responds that "[b]ecause Defendant's aggravated-assault convictions and aggravated-battery convictions are not based on unitary conduct, they do not result in a double jeopardy violation." We agree with the State.

**{38}**     The double jeopardy analysis for double-description cases applies to this argument because Defendant's aggravated-assault and aggravated-battery convictions arise under different statutes. "In reviewing a double-description double jeopardy challenge, . . . we must first determine whether the defendant's conduct was unitary, requiring an analysis of whether or not a defendant's acts are separated by sufficient 'indicia of distinctness'." *State v. Torres*, 2018-NMSC-013, ¶ 18, 413 P.3d 467 (citation omitted). "If the conduct is not unitary, then there is no double jeopardy violation." *Id.* "If the conduct is unitary, we must determine whether the Legislature intended multiple punishments for the unitary action." *Id.*

**{39}**     "Conduct is unitary when not sufficiently separated by time or place, and the object and result or quality and nature of the acts cannot be distinguished." *State v. Silvas*, 2015-NMSC-006, ¶ 10, 343 P.3d 616. In considering whether conduct is unitary, the courts "have looked for an identifiable point at which one of the charged crimes had been completed and the other not yet committed." *State v. DeGraff*, 2006-NMSC-011, ¶ 27, 139 N.M. 211, 131 P.3d 61. The courts have also "looked for an event that intervened between" the crimes at issue, distinguishing the crimes from one another. *Id.*

**{40}**     The evidence at trial was that Defendant and his companions drew and pointed their guns at the Raels after the argument involving Defendant, his two companions, and the Raels began. The men argued and yelled at one another, and Defendant and his companions continued to point their guns at the Raels until they heard the sound of a siren. At that point, Defendant and his companions lowered their guns to their sides, and everyone stopped arguing. After the passing of the vehicle with the siren, which turned out to be an ambulance and not a police car, one of Defendant's companions moved onto the Raels' porch, and the violence between the two groups ensued, culminating in the injuries to Paul and Manuel.

**{41}**     Defendant argues that the conduct underlying his aggravated-assault and aggravated-battery convictions was unitary. He contends that "the pointing of the firearms occurred in the same place as the firing of them and occurred within a matter of seconds or, at most, minutes. Moreover, the nature and quality of the alleged acts demonstrate that they are necessarily related: pointing guns at the targets was an essential antecedent to firing them at the targets."

**{42}** The State responds, and we agree, that "[a]fter lowering their guns at the sound of a siren, Defendant and his companions had an opportunity to walk away, having made their threats without harming anyone. But they chose, instead, to do more." The passing siren and subsequent brief moment of repose stand as identifiable points marking the completion of the assaults (the initial pointing of guns) and the forthcoming batteries. Once the ambulance passed, Defendant and his companions again raised their guns in a second, distinct act of aggression before firing at Paul and Manuel. Under these circumstances, the conduct underlying Defendant's aggravated-assault convictions and the conduct underlying his aggravated-battery convictions were separated by sufficient indicia of distinctness. Because Defendant's conduct was not unitary, there is no double jeopardy violation in Defendant's aggravated-battery and aggravated-assault convictions. *See Torres*, 2018-NMSC-013, ¶ 18 ("If the conduct is not unitary, then there is no double jeopardy violation.").

**6.    Defendant's sentence enhancements for using a firearm in committing aggravated battery and aggravated assault**

**{43}** Defendant argues that "aggravation" of the sentences for his assault and battery "charges based upon the presence of a firearm" results in double jeopardy, "requiring that the firearm enhancements be vacated." The State responds that this Court recently rejected this argument in *State v. Baroz*, 2017-NMSC-030, 404 P.3d 769. We agree. In *Baroz*, the Court held,

> The legislative policy behind the firearm sentence enhancement[, NMSA 1978, § 31-18-16(A) (1993),] is that a noncapital felony, committed with a firearm, should be subject to greater punishment than a noncapital felony committed without a firearm because it is more reprehensible. The very nature of a firearm enhancement is to require the sentencing judge to increase or enhance the basic sentence that applies to the crime. By enacting the enhancement, the Legislature intended to authorize greater punishment for noncapital felonies committed with a firearm. We conclude the Legislature intended to authorize an enhanced punishment when a firearm is used in the commission of aggravated assault. The sentence enhancement does not run afoul of double jeopardy[.]

*Id.* ¶ 27 (footnote omitted). Similarly, following *Baroz* in *State v. Branch*, the Court of Appeals concluded that the sentences for the defendant's aggravated-assault and aggravated-battery convictions, which were each increased by the firearm enhancement, did not violate double jeopardy. *See* 2018-NMCA-031, ¶¶ 32-34, 417 P.3d 1141.

**{44}** *Baroz* and *Branch* are directly applicable here. The basic sentences of three years for Defendant's third-degree aggravated-battery conviction and eighteen months for his fourth-degree aggravated-assault conviction, *see* NMSA 1978, § 31-18-15(A)(9)-(10) (2007), were each increased by one year, to four years and to thirty months respectively, consistent with the firearm enhancement statute, § 31-18-16(A). Because

the Legislature intended to authorize an enhanced punishment when a firearm is used in the commission of aggravated assault and aggravated battery, the firearm enhancement of the sentences for these convictions did not violate double jeopardy.

**C.      The district court ruling when the State elicited testimony about Defendant's affiliation with the Black Berets Motorcycle Club**

**{45}**     Finally, Defendant argues that the district court erred in failing to declare a mistrial when the State elicited testimony regarding the motorcycle club with which Defendant and his companions were affiliated, in violation of the district court's pretrial ruling. The State responds that "[t]he prosecutor's questions were permissible under the doctrine of curative admissibility and, therefore, did not amount to prosecutorial misconduct." Further, the State asserts that the district court's "curative instruction was sufficient to prevent prejudice from the prosecutor's questioning." We agree with the State.

**{46}**     We review the district court's evidentiary rulings for an abuse of discretion. *State v. Rojo*, 1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829. Further, the appellate courts "review the denial of [a d]efendant's motion for mistrial based on prosecutorial misconduct for an abuse of discretion." *State v. Sena*, 2018-NMCA-037, ¶ 7, 419 P.3d 1240. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *Rojo*, 1999-NMSC-001, ¶ 41 (internal quotation marks and citation omitted).

**{47}**     If the district court determines that a prosecutor's comment or questioning of a witness "is substantially likely to cause a miscarriage of justice, the judge should grant a defendant's motion for a mistrial." *See State v. Reynolds*, 1990-NMCA-122, ¶ 12, 111 N.M. 263, 804 P.2d 1082. However, when a defendant gives testimony "that 'opens the door' to inadmissible evidence, the doctrine of curative admissibility in some circumstances may permit the State to rebut that claim with otherwise inadmissible evidence." *State v. Tollardo*, 2012-NMSC-008, ¶ 22, 275 P.3d 110.

**{48}**     For example, in *State v. Andrade*, where the defendant physically attacked the victim while committing aggravated burglary, the district court granted the defendant's motion to exclude evidence of his prior arrests for battery and shoplifting pursuant to Rule 11-404 NMRA (1993). *See* 1998-NMCA-031, ¶¶ 2, 12-14, 124 N.M. 690, 954 P.2d 755. In her cross-examination by the defense, the victim testified about the defendant's prior arrests for battery and shoplifting. *Id.* ¶ 14. When the defendant subsequently took the stand on his own behalf, he testified that during his relationship with the victim, she often beat him and forced him to shoplift for her. *Id.* ¶ 17. On cross-examination of the defendant, the prosecutor asked the defendant about his history of shoplifting and prior arrests for battery. *Id.* ¶ 21. The Court of Appeals determined that no prosecutorial misconduct occurred as a result of the prosecutor's cross-examination of the defendant because the defendant's testimony opened the door to the prosecutor's questioning. *Id.*

¶ 21. The Court reasoned that "[g]iven that [the d]efendant opened the door regarding prior violent episodes between [the d]efendant and [the v]ictim, he cannot complain that the State questioned him regarding who really beat whom. Such responsive evidence is admissible under the doctrine of curative admissibility[.]" *Id.* Therefore, the Court concluded, although the evidence concerning the defendant's prior arrests for shoplifting and battery had initially been excluded, when the defendant "contended on direct examination that he was shoplifting to satisfy [the v]ictim's demands, the State could properly pursue cross-examination" to rebut the defendant's statements. *Id.*

**{49}** Prior to trial in this case, the State filed notice of intent to introduce other acts evidence under Rule 11-404(B). In pertinent part, the State sought to introduce evidence that Defendant was affiliated with the Black Berets Motorcycle Gang. The State asserted that

> Defendant has affiliations with the Black Beret's Motorcycle Gang. He was allegedly stripped of his membership for trafficking narcotics. Simultaneously, a group of "rogue" Black Beret members had become increasingly violent and had originated by an agreement that each of these members in this "rogue" crew were willing to commit murder for the club. Two of these "rogue" members are co-Defendants Ricardo Romero, and David Ulibarri. . . . This information is relevant to show that the Defendant knew his co-defendant's would resort to deadly violence on Defendant's behalf, and that they acted in concert on February 1, 201[5] when they came to the Rael house to shoot the victims.

The district court addressed the admissibility of this evidence on the first day of trial. The State argued concerning the proffered evidence as follows: "I think it's important to the conspiracy charge that Mr. Comitz knows if he brings these two guys, they're, you know, they're brothers. That means something, that they would fight on behalf of Mr. Comitz. And I think that's pertinent to the conspiracy charges in this case." Defense counsel objected to the State being able to reference the group with which Defendant and his companions were affiliated as a "motorcycle club." The district court ruled that the State could reference the affiliation as with a "club" but not a "motorcycle club," which would tend to reinforce the inference the State sought to elicit—that Defendant and his companions "have this brotherhood going on."

**{50}** At trial, when defense counsel asked Defendant whether he was "a member of any clubs or groups[,]" Defendant answered that he was a member of the "Black B[e]rets Motorcycle Club." Defendant proceeded to describe the club as a support club for POW/MIA veterans that raises money for "toys and stuff" for veterans' families. Defendant also testified that the two men who accompanied him to the Raels' home on the day of the shooting were also part of that club.

**{51}** The prosecutor asked on cross-examination whether the Black Berets are a motorcycle gang, to which Defendant responded, "No." The prosecutor proceeded by saying, "You're telling me that the Black B[e]rets are not affiliated with the Banditos

organized motorcycle gang?" Again, Defendant answered, "No." Defendant further testified that he was still a member of the Black Berets, and in response the prosecutor asked, "It's not true that you were kicked out of that club for selling methamphetamine?" Defense counsel objected and requested a mistrial based on the district court's pretrial ruling, which the district court denied. However, in response to the objection, the district court instructed the jury that "[t]he last question asked by the State and the answer given by the witness will be stricken. I ask you to disregard it and do not consider it in your deliberations[.]"

{52}     Under the circumstances, we conclude that the district court did not abuse its discretion in denying Defendant's motion for a mistrial based on the prosecutor's cross-examination of Defendant. Similar to *Andrade*, when Defendant testified on direct examination that he was part of the Black Berets Motorcycle Club and that it was a charitable club, he opened the door to cross-examination on these issues under the doctrine of curative admissibility. Assuming the prosecutor's specific question to Defendant about whether he was kicked out of the Black Berets for selling methamphetamine was improper, the district court effectively addressed the potential of prejudice to Defendant by instructing the jury to disregard the question and Defendant's answer. *See State v. Smith*, 2016-NMSC-007, ¶ 46, 367 P.3d 420 ("An error committed by admitting inadmissible evidence is generally cured by a ruling of the court striking the evidence and admonishing the jury to disregard such evidence."). Accordingly, we conclude that the district court did not abuse its discretion in denying Defendant's motion for a mistrial.

## III.     CONCLUSION

{53}     We affirm Defendant's convictions of second-degree murder under Count 1, one count of aggravated battery under Count 3 (Paul), one count of aggravated battery under Count 4 (Manuel), one count of conspiracy to commit aggravated battery under Count 5, one count of aggravated assault under Count 6 (Paul), one count of aggravated assault under Count 7 (Manuel), and one count of child abuse under Count 9, together with the associated firearm enhancements as decided by the jury. We vacate Defendant's other convictions. We remand this case to the district court for further proceedings in accordance with this opinion.

{54}     **IT IS SO ORDERED.**

**MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

**JUDITH K. NAKAMURA, Chief Justice**

**BARBARA J. VIGIL, Justice**

**PETRA JIMENEZ MAES, Justice, Retired**
**Sitting by designation**

**CHARLES W. DANIELS, Justice, Retired**
**Sitting by designation**