This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: June 5, 2025**

**No. S-1-SC-40029**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**TRAVIS NOLAN,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LINCOLN COUNTY**
**Daniel A. Bryant, District Judge**

Bennett J. Baur, Chief Public Defender
Kimberly Chavez Cook, Appellate Defender
Mark A. Peralta-Silva, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Van Snow, Acting Deputy Solicitor General
Santa Fe, NM

for Appellee

## DECISION

**VIGIL, Justice.**

**{1}** Defendant Travis Nolan appeals directly to this Court from his convictions for first-degree murder, armed robbery, and tampering with evidence. For these crimes he was sentenced to life in prison plus fifteen years, including a three-year sentence enhancement for using a firearm in the commission of the armed robbery.

**{2}** Defendant presents three arguments. First, he asserts that the district court erred by denying Defendant the opportunity to present surrebuttal evidence at trial. Second, he claims that the district court erred by admitting a photograph of a tattoo on Defendant's chest and a video call in which Defendant discussed the tattoo. Third, he argues that the three-year firearm sentence enhancement is an illegal sentence.

**{3}** The State correctly concedes that the firearm enhancement imposed by the district court is contrary to law because only a one-year enhancement is allowed under Defendant's circumstances. We reject Defendant's other arguments for reasons explained herein. We affirm Defendant's convictions and remand for resentencing in accordance with our conclusion that Defendant's three-year firearm sentencing enhancement is illegal. We exercise our discretion to decide the issues through a nonprecedential decision pursuant to Rule 12-405(B) NMRA.

## I.  BACKGROUND

**{4}** Victim Christopher Williams was killed in his truck on May 25, 2019, by three shotgun blasts from no more than four feet away. Each shot inflicted fatal injuries. He was pushed out of his truck. Defendant admits to the killing, but claimed at trial that the killing was in self-defense.

**{5}** Defendant first met Victim a few weeks prior to the killing. Defendant testified that he sold marijuana to Victim and then accepted an invitation to a party at an apartment where Victim sometimes stayed. Defendant stated that he felt reluctant to attend the party because he had seen Victim showing off—"flossing"– a .380 handgun.

**{6}** Victim's roommate, Patrick Sanchez, testified that he saw Defendant, Victim, and another person drinking at the party. Sanchez decided to go upstairs to visit with his girlfriend and, on the way, heard Defendant and Victim agree to pretend to fight one another—to shadowbox. Sanchez testified that from upstairs he heard Defendant shout that he was willing to fight Victim but did not want to die over "something like this." Sanchez went downstairs and saw Victim pointing a gun at Defendant, who had his hands up. Sanchez took the gun from Victim and unloaded it.

**{7}** From the back and forth between Defendant and Victim, Sanchez gleaned that Defendant punched Victim twice, contrary to their agreement not to hit one another. As recompense, Victim wanted "two licks" on Defendant. Although Defendant declined to let Victim hit him, he agreed to fight outside. Once outside the apartment, Defendant and Victim took off their shirts and assumed fighting stances. Sanchez further testified that just as they were about to fight, Victim turned like he was going to go back inside and said, "I got something for him." Defendant ran off.

**{8}** A few weeks before the killing, on April 26, Defendant attempted to purchase a 12-gauge shotgun from a sporting goods store, but the purchase was delayed for a background check. Defendant picked up the shotgun on May 10.

**{9}** On the morning of the killing, May 25, Defendant's brother, Derek Chavez, received multiple phone calls from Defendant. During the first phone call, Defendant

asked Chavez to help him "do dirt." Chavez understood "dirt" to mean cause harm. Chavez declined Defendant's request and ignored the rest of Defendant's phone calls.

{10}    Also on the day of the killing, Defendant stopped by Victim's apartment twice looking for Victim. Victim was not there; but Sanchez, Sanchez's girlfriend, and another person were at the apartment. Defendant had a backpack with him. Sanchez's girlfriend testified that she saw a gun wrapped in a red hoodie sticking out of the backpack. She heard Defendant repeatedly say he wanted to meet up with Victim to take Victim's truck. In her view, Defendant was "adamant" about taking the truck and seemed "ambitious that he wanted to do it." Defendant asked Sanchez to call Victim to set up a meeting between Defendant and Victim, at the apartment or somewhere else. Although Sanchez agreed to set up the meeting, he never followed through. After the second visit, Sanchez and his girlfriend gave Defendant a ride to Two Rivers Park.

{11}    Defendant called his then sister-in-law, Shawnee Walker, to ask for a ride. Walker picked him up at Two Rivers Park. Defendant told Walker that he was going hiking with a friend and asked to be dropped off near a bridge. During the ride, Defendant repeatedly asked to get in contact with Chavez so that they could do "dirty work." To Walker, "dirty work" meant, in essence, "harming somebody." Walker noticed that Defendant had a shotgun covered by a red hoodie sticking out of his bag. Walker asked Defendant not to do anything stupid and dropped him off.

{12}    On the evening of the killing, Defendant knocked on the door to Victim's parents' home—where Victim was staying at the time and where Defendant had been before. Defendant testified that he went to Victim's parents' house because he was running around that day selling marijuana "to everybody . . . here and there" and wanted to sell Victim marijuana. Victim talked to Defendant outside of the house, then went back inside to tell his mother that he was going to give Defendant a ride to the store and would be home in a few minutes.

{13}    Defendant testified that he and Victim got into Victim's truck, and Victim gave Defendant some Suboxone. The conversation "seem[ed] good," according to Defendant, but after about five minutes the encounter changed when Defendant threw up "a little bit," perhaps from the Suboxone. Defendant testified that he and Victim began arguing because Victim thought he was "faking it," referring to the vomiting or nausea. According to Defendant, Victim was also upset that Defendant knew where Victim lived but Victim did not know where Defendant lived.

{14}    Defendant testified that he wanted to get out of the truck at that point, but Victim would not let him out. Instead, Victim insisted on bringing Defendant back to Defendant's house. Defendant testified that he tried to trick Victim by instructing him to drive to his brother's house. But Victim didn't believe that Defendant lived where Defendant instructed him to go because Victim had met Defendant in a different area on a prior occasion.

{15}    Then, according to Defendant, they "just kind of looked at each other . . . didn't say nothing, just kind of staring at each other's eyes and next thing you know we just

started [fighting]." Defendant was not sure who struck first. Defendant stated that, once the two of them started fighting, they "reached the point where one of [them was] going to have to die." Defendant testified that he and Victim both reached for their weapons. Victim reached for a handgun that, according to Defendant, Victim had by his thigh; Defendant grabbed his shotgun.

{16} Defendant testified that he shot Victim during the struggle. Defendant pumped the shotgun while keeping his finger on the trigger, resulting in multiple shots. He did not remember how many shots he fired because there was a lot of adrenaline, but later learned that it was three shots. According to the forensic pathologist, one of the shots was from two to four feet away, in the back area.

{17} Defendant testified that, after he killed Victim, he did not know how to act or think, and was not going to "stay and wait for them to get [him]." Defendant pushed the dead body out of the vehicle and left Ruidoso, driving Victim's truck to Arizona to see Defendant's father.

{18} Defendant arrived at the home of his father in the middle of the night. Defendant did not talk to or stay with his father, whom he had not seen in six years. Instead, he stayed at a hotel. Defendant's brother picked up Defendant in Arizona at their mother's request.

{19} Defendant testified that he burned Victim's truck and disposed of the shotgun somewhere between Ruidoso and Phoenix. Defendant did not remember what he did with the handgun that he asserts Victim had on the night of the killing. Defendant did not remember removing Victim's handgun from the truck. When the truck was found in a salvage yard, badly burned, there was no gun. As stated above, Defendant testified that Victim had a .380 handgun on the day they met weeks prior to the day of the murder. Victim's father found Victim's .380 handgun in his home sometime after Victim was killed. Victim's mother testified that the .380 handgun was, to her knowledge, Victim's only gun.

{20} Chavez later asked Defendant why Defendant "would do something and throw that body by [Chavez's] house." Chavez testified that, in response, Defendant said that "you were supposed to help me that day, and you didn't, so I had to leave you a mess."

{21} When interviewed by the police, Defendant lied about the killing. He stated that he did not have any involvement in Victim's death. He said he had not seen Victim since their fight during the party at Victim's apartment. He stated that on the night of the homicide his father picked him up from Ruidoso and brought him to Arizona, and that Chavez brought him back from Arizona. At trial, Defendant testified that he lied to the police because he had been "locked up since [he] was thirteen years old, . . . just barely got out," and did not want to "go back."

{22} The jury received a self-defense instruction but rejected that theory of events, convicting Defendant of willful and deliberate first degree murder, armed robbery, and tampering with evidence.

**{23}**  Additional background will be provided as necessary in the Discussion section.

## II.  DISCUSSION

### A.  Defendant Is Not Entitled To a New Trial Because the District Court Denied Him the Opportunity To Present Surrebuttal Evidence

**{24}**  In addition to the evidence discussed above, the State in its rebuttal to Defendant's case presented and read to the jury a letter written by Defendant in jail. Defendant's letter was addressed to his mother, and offered a different narrative of the events surrounding the homicide. Essentially, Defendant's letter stated as follows: On the day of the homicide, Defendant was contacted by an unnamed Native American man who wanted Defendant and Victim to resolve their dispute—"to squash [their] beef"—so Victim could once again purchase marijuana. Defendant claimed he took Suboxone and threw up. There was an argument about whether Defendant or the Native American man stole Victim's Suboxone strips. Defendant nodded in and out of consciousness. At one point, he woke up and realized that Victim was no longer in the truck and that the Native American man had driven them to a dirt road on the reservation. The Native American man left. Defendant then found himself in a truck heading to his father's house in Arizona. He left his father's house, went to a motel to rest, and then went back to Ruidoso. He let a Mexican man use the truck for errands in exchange for $500 but the Mexican man did not return with the money.

**{25}**  After the State's rebuttal, Defendant requested a surrebuttal to recall Defendant to address the letter. The prosecutor objected, stating that he had never encountered a surrebuttal before. The district court reminded the State that surrebuttal is allowed under certain circumstances, and a bench conference ensued. *See* Rule 5-607(I) NMRA (providing that, in a criminal trial, "the defense may submit evidence in surrebuttal").

**{26}**  Counsel for Defendant stated that, although the letter was known to Defendant, was provided during discovery, was on the State's exhibit list, and the witness who provided foundation for the letter was on the State's witness list, Defendant assumed that the State did not have the foundation to put the letter into evidence because the State did not use the letter during its case in chief. Defendant stated that he "should have expected" the foundational witness to be present to testify.

**{27}**  The State explained that it considered bringing the letter into evidence earlier but ultimately declined. The State decided to enter the letter into evidence only after Defendant provided a different narrative in his testimony from both the letter and from the account provided to officers during his initial videotaped interview.

**{28}**  In response, counsel for Defendant stated that, although he discerned no ill will on the part of the State, he "didn't think [the State] had to wait until [Defendant] closed [his] case and they made sure of that before they brought [the foundational witness] in and it's strategy. So maybe it's just my loss."

**{29}**  The district court stated that the standard for allowing surrebuttal is "if there is something about the rebuttal evidence that is new and surprising and unknown." It

concluded that, under the facts presented, this standard was not met, and denied Defendant the opportunity to retake the stand on surrebuttal.

**{30}** Defendant makes two arguments on appeal. First, Defendant argues that the district court committed error because it evaluated the request for surrebuttal under an incorrect legal standard by requiring that the rebuttal evidence be "surprising." We review this argument for an abuse of discretion. *State v. Fernandez*, 2023-NMSC-005, ¶ 8, 528 P.3d 621. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Bailey*, 2017-NMSC-001, ¶ 12, 386 P.3d 1007 (internal quotation marks and citation omitted).

**{31}** Second, Defendant argues that when the district court denied him the opportunity to present a surrebuttal, it violated his constitutional guarantee of "a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotation marks and citation omitted). Defendant concedes that this constitutional claim is unpreserved; therefore, we review for fundamental error. *See State v. Silva*, 2008-NMSC-051, ¶ 11, 144 N.M. 815, 192 P.3d 1192 (noting that this Court may review an unpreserved claim for fundamental error). Under fundamental error review, we only reverse where "the defendant's guilt is so questionable that upholding a conviction would shock the conscience, or where, notwithstanding the apparent culpability of the defendant, substantial justice has not been served . . . [because] a fundamental unfairness . . . has undermined judicial integrity." *Id.* ¶ 13 (internal quotation marks and citation omitted). We review Defendant's arguments in turn.

## 1. The District Court did not err in denying Defendant's surrebuttal

**{32}** Rule 5-607(I) provides that the defense may provide surrebuttal in a criminal trial. A defendant should be permitted to introduce evidence on surrebuttal when the prosecution introduces a new matter during rebuttal. *State v. Doe*, 1983-NMCA-012, ¶ 12, 99 N.M. 456, 659 P.2d 908; *see also* 75 Am. Jur. 2d *Trial* § 287 (2025) ("As a general rule, a party does not have a right to reply to evidence given on rebuttal, or to introduce evidence by way of surrebuttal, unless new matter has been introduced in the rebuttal."). However, if the defense seeks to introduce evidence on surrebuttal that would be "cumulative or confirmatory," the trial court may deny surrebuttal even if a new matter was introduced by the prosecution during rebuttal. *Doe*, 1983-NMCA-012, ¶ 11.[1]

**{33}** With regard to the instant case, we agree with Defendant that the district court improperly added "surprise" to the legal standard courts apply to determine whether or not to grant surrebuttal. *See Doe*, 1983-NMCA-012, ¶¶ 11-15 (explaining that a surrebuttal should be allowed when a rebuttal introduces new matter, but concluding that the district court did not abuse its discretion by declining to admit "cumulative

---

[1] Defendant suggests that we elaborate on our standard for surrebuttal. We decline at this time. The existing standard for evaluating a request for surrebuttal described herein is appropriate.

surrebuttal testimony"). But applying the correct standard, we nevertheless affirm the district court. *See State v. Marquez*, 2023-NMSC-029, ¶ 32, 539 P.3d 303 (stating that an appellate court can affirm the decision of a district court if it was right for any reason, as long as affirmance is not unfair to the appellant). We explain.

**{34}** Defendant argues that his letter was a new matter introduced by the prosecution, and that the district court abused its discretion when it did not allow Defendant to retake the stand to "explain why he wrote the letter." We are not persuaded that the letter introduced a new matter into the trial. The letter introduced a narrative of events related to the homicide. There was already a lot of testimony about those events, including from Defendant himself. Accordingly, we conclude that the substance of the letter did not raise a new matter—it was responsive to Defendant's testimony about events on the day of the homicide.

**{35}** Moreover, the State did not introduce testimony as to the reason Defendant wrote the letter, so Defendant's proposed explanatory testimony would not have been responsive to the State's rebuttal. If Defendant wanted to provide explanatory background for the letter, Defendant could have testified about this background during his case in chief. And, in any event, Defendant did not argue to the district court that he should have been provided surrebuttal to explain why he wrote the letter; he was not specific in the district court about the nature of his proposed surrebuttal testimony. For these reasons, we cannot conclude that the district court's decision to deny Defendant surrebuttal was untenable or unreasonable. *See Bailey*, 2017-NMSC-001, ¶ 12 ("We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason.").

**{36}** And even if the district court was incorrect to deny Defendant the opportunity to provide surrebuttal evidence, the error was harmless. We review non-constitutional error by examining whether there is a reasonable probability that the error affected the jury's verdict, and we will not reverse the decision below unless the error rises to this standard. *State v. Tollardo*, 2012-NMSC-008, ¶¶ 25, 36, 275 P.3d 110. We conduct this examination by evaluating all of the circumstances surrounding the error, including, but not limited to, "the source of the error, the emphasis placed on the error, evidence of the defendant's guilt apart from the error, the importance of the erroneously admitted evidence to the prosecution's case, and whether the erroneously admitted evidence was merely cumulative." *Fernandez*, 2023-NMSC-005, ¶ 24 (internal quotation marks and citation omitted).

**{37}** There was considerable evidence that Defendant sought out and killed Victim intentionally. He was clearly determined to meet Victim on the day of the homicide. He carried his shotgun with him during the day. He mentioned taking Victim's truck repeatedly, and seemed "adamant" about it. He tried several times to contact his brother to help him do "dirty work," a term which was understood by multiple witnesses as meaning to harm someone. After the homicide, Defendant pushed Victim's dead body out of the truck and then fled to avoid getting caught. And he destroyed evidence. The evidence against Defendant was varied and compelling; his surrebuttal would not have dented this evidence.

**{38}** Defendant argues that surrebuttal was important to his case because explaining why he wrote the letter would have provided him with an opportunity to restore his credibility. But we conclude that it is highly unlikely that Defendant's explanation could have had this effect. Defendant told numerous lies to the police during his initial interview. The overwhelming evidence undermines Defendant's testimony that he was running around all day selling marijuana to "everybody . . . here and there." There is evidence that strongly suggests that Victim did not have a gun when he was killed, contrary to Defendant's testimony. The denial of surrebuttal, even if erroneous, was not that important to Defendant's case.

**{39}** Thus, having evaluated the circumstances surrounding the purported error, including the factors listed above, *see Fernandez*, 2023-NMSC-005, ¶ 24, we conclude that there is no reasonable probability that the error affected the jury's verdict. *Tollardo*, 2012-NMSC-008, ¶ 36. Accordingly, even if we assume that the district court abused its discretion by denying Defendant the opportunity in surrebuttal to explain his reasons for writing the letter, we conclude that any such error would have been harmless.

## 2. Defendant was not denied a meaningful opportunity to present a defense

**{40}** Defendant's other argument is that when the district court denied him the opportunity to present a surrebuttal, it violated his constitutional guarantee of "a meaningful opportunity to present a complete defense." *Holmes*, 547 U.S. at 324 (internal quotation marks and citation omitted). Defendant concedes that this constitutional claim is unpreserved; therefore, we review for fundamental error. *See Silva*, 2008-NMSC-051, ¶ 11. Under fundamental error review, we only reverse where "the defendant's guilt is so questionable that upholding a conviction would shock the conscience, or where, notwithstanding the apparent culpability of the defendant, substantial justice has not been served . . . [because] a fundamental unfairness . . . has undermined judicial integrity." *Id.* ¶ 13.

**{41}** Given that we are not persuaded that the district court committed error by denying Defendant surrebuttal, we conclude that there was no fundamental error. We decline to order a new trial on the basis of Defendant's argument that the district court denied him "a meaningful opportunity to present a complete defense," *Holmes*, 547 U.S. at 324 (internal quotation marks and citation omitted), in violation of Defendant's constitutional rights.

**{42}** In sum, we affirm the district court's decision to deny Defendant surrebuttal.

## B. The District Court Did Not Abuse Its Discretion by Admitting Evidence Related To Defendant's Tattoo

**{43}** Defendant made a video call to his mother and his brother from jail in December, 2021. The video call was monitored and recorded by the authorities. In the video, Defendant's mother saw part of a new tattoo on Defendant's chest, beneath his shirt. She asked him about it. He resisted showing it to her, referring to it as "kinda incriminating shit." He subsequently said that he got the tattoo to "do something, get

something to remind [him] of what [he] just did" so he would never do it again. After reviewing the video, an officer applied for a warrant to photograph Defendant's tattoo, which reads "Seed of Cain."

**{44}**    The State sought to admit the video and two photographs of the tattoo taken in jail pursuant to the warrant. Counsel for Defendant argued that the district court should not admit the video pursuant to Rule 11-403 NMRA because the probative value of the video was substantially outweighed by the danger of unfair prejudice, misleading the jury, and confusing the jury.

**{45}**    Defendant's counsel argued, in essence, that the video was not probative because the Defendant got the tattoo more than two years after the killing and it may have been inspired by a battery charge or charges filed against Defendant for behavior in custody, rather than the killing. Counsel also argued that the biblical reference was subject to multiple inferences, and it was not clear whether Defendant was identifying with Cain as a deliberate murderer or simply as someone who has done something wrong and was punished for it. But counsel for Defendant twice conceded that, in his view, the district court would not be abusing its discretion if it admitted the evidence. Moreover, counsel for Defendant acknowledged that if Defendant testified, he would be able to explain the tattoo, which would render the prejudice moot.

**{46}**    The State argued to the district court that the video and the tattoo were probative. The State argued that the tattoo's reference to Cain, as the first murderer in the Bible, was relevant to two elements of the first-degree murder charge: the killing of another human being and doing so with deliberate intent. It was additionally relevant, argued the State, because Defendant had not (at that point in the trial) admitted that he killed Victim. Moreover, in the video, Defendant stated that the tattoo was incriminating. The State's position was that the tattoo was a confession, and if Defendant wanted to testify that there was an alternative explanation he could do so. The State argued that there was no undue prejudice.

**{47}**    The district court admitted the video and one of the photographs of Defendant's tattoo, but declined to admit a photograph that showed Defendant in his prison uniform. After the video was played and the photograph was shown to the jury, a witness for the State briefly explained that "the murder Cain committed was the first murder documented in the Bible."

**{48}**    We review this decision of the district court for an abuse of discretion. *See Fernandez*, 2023-NMSC-005, ¶ 8 ("We review the district court's decision to admit or exclude evidence for an abuse of discretion."). "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *Bailey*, 2017-NMSC-001, ¶ 12 (internal quotation marks and citation omitted).

**{49}**    Defendant argues on appeal that the district court abused its discretion to admit the video and the photograph because they "likely aroused the prejudices and passions

of the jury due to the inflammatory nature of Cain's murder in the Bible." "Cain's story[,]" states Defendant, "does not capture the self-defense in which [Defendant] shot [Victim]" and, "[b]y making this analogy, the State appealed to the prejudice of any member of the jury who would find Cain to be morally despicable."

**{50}** As did trial counsel for Defendant, we conclude that the district court did not abuse its discretion to admit the evidence at issue. The State points out on appeal that the evidence was highly probative. Defendant chose to tattoo his body with a phrase that served to associate himself with an infamous, symbolic killer. He told his mother that he got the tattoo to remind him of what he had done and that it was incriminating. The prejudice to Defendant's case from Cain's story is not unfair but, instead, simply the probative value of the evidence. *See State v. Anderson*, 1994-NMSC-089, ¶ 63, 118 N.M. 284, 881 P.2d 29 ("Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence that tends to suggest decision on an improper basis.").

**{51}** We agree with Defendant that the religious context of the story might arouse a passionate response in some jurors, but Defendant has not cited any authority to demonstrate that a religious reference is so prejudicial that a court cannot admit such evidence. On the facts before us, we think that balancing the potential for inflammatory response from the jurors against the significant probative value was well within the discretion of the district court. Because we do not conclude that the district court's ruling admitting the video and photograph is clearly untenable or unjustified by reason, we decline Defendant's argument that it was erroneous. *See Bailey*, 2017-NMSC-001, ¶ 12 (defining abuse of discretion standard of review).

## C. The District Court Erred by Imposing a Three-year Firearm Enhancement Under a Statute That Authorized Only a One-year Enhancement

**{52}** The district court enhanced Defendant's sentence for armed robbery by three years because Defendant used a firearm in the commission of that crime. Defendant argues that this was contrary to law because the statute applicable at the time, NMSA 1978, Section 31-18-16 (1993, amended 2022), allowed only a one-year enhancement under the circumstances. The State concedes the point. Although we are not bound by the State's concession, *State v. Comitz*, 2019-NMSC-011, ¶ 25, 443 P.3d 1130, we agree that the three-year sentence enhancement is illegal.

**{53}** Pursuant to Section 31-18-16 (1993), when a jury finds that a defendant used a firearm in the commission of a noncapital felony (such as armed robbery), the basic sentence must be increased by one year if the offense is the defendant's first felony. Section 31-18-16(A) (1993). And if the offense is not the defendant's first felony, then the sentence shall be increased by three years. Section 31-18-16 (B) (1993). In this case, there is no indication from the sentencing hearing or otherwise that this was not Defendant's first felony. Accordingly, we conclude that Defendant's firearm enhancement must be one year rather than three years.

## III. CONCLUSION

**{54}** For the reasons stated, we affirm Defendant's convictions and remand for resentencing in accordance with our conclusion that Defendant's three-year firearm enhancement is contrary to law.

**{55} IT IS SO ORDERED.**

**MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

**DAVID K. THOMSON, Justice**

**C. SHANNON BACON, Justice**

**BRIANA H. ZAMORA, Justice**

**JULIE J. VARGAS, Justice**