This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: March 2, 2020**

**No. S-1-SC-36773**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**ROBERTO VARGAS,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY**
**Jane Shuler-Gray, District Judge**

Bennett J. Baur, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
Eran Shemuel Sharon, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**VIGIL, Justice.**

**{1}** For his role in a drive-by shooting resulting in the death of one victim and injury to another, Defendant Roberto Vargas was convicted of first-degree depraved mind murder, contrary to NMSA 1978, Section 30-2-1(A)(3) (1994); conspiracy to commit first-degree depraved mind murder, contrary to Section 30-2-1(A)(3) and NMSA 1978, Section 30-28-2 (1979); aggravated battery, contrary to NMSA 1978, Section 30-3-5 (1969); shooting at a dwelling, contrary to NMSA 1978, Section 30-3-8(A) (1993);

tampering with evidence, contrary to NMSA 1978, Section 30-22-5 (2003); and contributing to the delinquency of a minor, contrary to NMSA 1978, Section 30-6-3 (1990).

**{2}** Considering Defendant's various arguments on appeal, we conclude that: (A) the evidence was insufficient to support Defendant's convictions for tampering with evidence and shooting at a dwelling; (B) we need not address whether Defendant's convictions for shooting at a dwelling and first-degree depraved mind murder violate the prohibition against double jeopardy; (C) Defendant's conviction for conspiracy to commit depraved mind murder must be vacated because it is a nonexistent crime; (D) the lack of an intoxication instruction did not result in fundamental error; (E) the district court's limitations on Defendant's cross-examination of two witnesses was not an abuse of discretion nor a violation of Defendant's constitutional right to confront the witnesses against him; and (F) Defendant's judgment and sentence must be corrected to reflect the jury's verdict. Because the questions of law raised by this case are sufficiently addressed by New Mexico precedent, we exercise our discretion under Rule 12-405(B)(1) NMRA to dispose of this case by non-precedential decision.

## I.    BACKGROUND

**{3}** This incident began with Defendant driving his friend, Abraham Venegas, and Abraham's cousin, Carlos Venegas, to Abraham's house in Carlsbad, New Mexico at around midnight following a party on July 4, 2016. Abraham then went to sleep.

**{4}** In the early morning hours of July 5, 2016, Eric Flores, Janell Villareal, Jesus "Jesse" Navarro, and Tamika Stearns were gathered outside of the home of Janell and Jesse's grandmother at 306 Peachtree Street in Carlsbad. As they were talking, Defendant and Carlos pulled up in a white truck, and Defendant got out. Defendant told the group he had been drinking and offered them some beer. Defendant then become loud and told Jesse that he wanted to speak to Tamika about something she had allegedly said. Jesse would not let Defendant talk to Tamika and asked Defendant to keep his voice down because people were sleeping.

**{5}** Defendant refused, and Jesse either put his arm around Defendant to usher him to leave or punched Defendant in the face. Defendant then took a swing at Jesse but missed and fell over. Defendant mistook Jesse's attempt to help him up as an attack and a fight broke out between Defendant and Jesse.

**{6}** During the fight, Defendant ended up by the driver's side door on the truck. From inside the truck, Carlos hit Jesse with an aluminum bat before Eric reached in and took it away. Eric then yelled for Janell to get his gun. Jesse, Janell, and Tamika all testified at trial that none of them, including Eric, had a gun. At that point, Defendant got back into the truck and fled, saying "I'm going to kill you . . . I'm going to kill all you motherfuckers."

**{7}** Abraham testified that he was woken up by Defendant and Carlos an hour or two after he fell asleep. Defendant and Carlos told Abraham that they had been jumped and that Carlos had been hit with a bat. Abraham testified that Defendant, who was angry and "really drunk," wanted to go back and fight. Abraham agreed to go because he was upset that Carlos had been hit. The three men then got into Abraham's truck, where Abraham kept his AK-47, and Abraham drove back towards Peachtree Street.

**{8}** Abraham testified that they stopped along the way so that he could relieve himself. At that point, Carlos got into the bed of the truck with the AK-47 and Defendant told him to "get ready." Abraham testified that, because he believed they were just going to fight, he thought Carlos had the gun only as a precaution. Abraham explained that, as they drove off, he turned off the lights of the truck but did not offer an explanation as to why. After driving for another two or three minutes, they arrived at Peachtree Street. Abraham testified that as he was bringing the truck to a stop at the house, he heard gunfire from the bed of the truck and saw Defendant shooting a shotgun from the passenger seat. Abraham claimed that he had not seen the shotgun in Defendant's hands until he started shooting. When the shooting started, Abraham sped away.

**{9}** Tamika testified that the white truck came back roughly five minutes after Defendant had initially driven away. As the truck pulled up to 306 Peachtree, Eric and Janell were backing out of the driveway in Eric's van. Jesse and Tamika were outside of Jesse's car on the driveway. Jesse and Janell testified that they heard someone yell, "What's up now?" before the gunfire started. When the firing started, Jesse ducked down behind his vehicle and testified that he could see a driver, a passenger, and someone in the bed of the truck but could not identify who they were. Tamika got inside Jesse's car and testified that she could tell the gunshots were coming from the white truck but did not see who was shooting. Janell testified that she saw Abraham driving the truck, Carlos in the bed, and Defendant in the front passenger seat.

**{10}** Eric was fatally shot in the lungs and heart with bullets from the AK-47. Janell was hit in the arm with pellets from the shotgun. The neighbor's house at 304 Peachtree was also damaged by gunfire.

**{11}** When Abraham, Carlos, and Defendant got back to Abraham's home, Abraham told Carlos and Defendant to get their things and leave. Abraham testified that he did not get his AK-47 out of the truck and did not see what happened to it. In a later search of Abraham's home and truck, a rifle was found in his truck but the shotgun used in the shooting was not found.

**{12}** Abraham took a plea deal and agreed to testify against Defendant. After a jury trial, Defendant was convicted of first-degree depraved mind murder, conspiracy to commit first-degree depraved mind murder, aggravated battery, shooting at a dwelling, tampering with evidence, and contributing to the delinquency of a minor. The jury additionally found that a firearm was used in the commission of the depraved mind murder and aggravated battery. Defendant was sentenced to life imprisonment plus

thirty-nine years, and appeals his convictions directly to this Court pursuant to Rule 12-102(A)(1) NMRA.

## II. DISCUSSION

### A.   There Was Not Sufficient Evidence Presented to Support Defendant's Convictions for Either Tampering with Evidence or Shooting at a Dwelling

**{13}**   Defendant challenges the sufficiency of the evidence supporting two of his convictions: tampering with evidence and shooting at a dwelling. "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). When reviewing for sufficiency of the evidence, "we employ a deferential standard in favor of the jury's verdict" and "view the evidence in the light most favorable to the State, resolving all conflicts and making all permissible inferences in favor of the jury's verdict." *State v. Consaul*, 2014-NMSC-030, ¶ 42, 332 P.3d 850 (internal quotation marks and citation omitted). "It is our duty to determine whether any rational jury could have found the essential facts to establish each element of the crime beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted).

**{14}**   Although Defendant raised the issue of the sufficiency of the evidence for all of his convictions in his statement of issues, in his brief in chief he makes no arguments regarding the sufficiency of the evidence for his convictions of first-degree depraved mind murder, conspiracy to commit depraved mind murder, aggravated battery, or contributing to the delinquency of a minor and has therefore abandoned those issues. *See State v. McDowell*, 2018-NMSC-008, ¶ 34, 411 P.3d 337 (concluding that, under Rule 12-318(A)(4) NMRA, sufficiency of the evidence arguments are abandoned if not briefed). Accordingly, we turn now to an analysis only of the sufficiency of the evidence supporting his convictions of tampering with evidence and shooting at a dwelling. We conclude the evidence was insufficient to support either conviction.

### 1.   Tampering with evidence

**{15}**   Defendant first challenges the sufficiency of the evidence for his conviction of tampering with evidence, contrary to Section 30-22-5. A conviction for tampering with evidence required that the jury find that (1) Defendant hid physical evidence; (2) he did so intending to prevent his "apprehension, prosecution, or conviction;" and (3) he did so in New Mexico on or about July 5, 2016. *See* UJI 14-2241 NMRA. Defendant argues and the State concedes that the only evidence related to this charge was testimony that an AK-47 and 12-gauge shotgun were used in the shooting, Abraham's testimony that he did not know what happened to the AK-47 after the shooting, and police testimony that a rifle, but not a 12-gauge shotgun, was found in a search of Abraham's home and truck.

**{16}** It is settled law that "[t]he State cannot convict Defendant of tampering with evidence simply because evidence that must have once existed cannot now be found." *State v. Guerra*, 2012-NMSC-027, ¶ 16, 284 P.3d 1076. The State concedes that the evidence in this case was insufficient to prove that Defendant had a specific intent to tamper with evidence. *Id.* ¶ 14 (requiring either direct or circumstantial evidence of an intent to tamper). Because the evidence merely establishes that a firearm used in the shooting could not be found, the evidence is insufficient to support Defendant's conviction for tampering with evidence and that conviction must therefore be overturned.

## 2.     Shooting at a dwelling

**{17}** Defendant also argues that the evidence was insufficient to prove that he "willfully shot at a dwelling," contrary to Section 30-3-8(A). A conviction for this offense required the jury to find that (1) Defendant "willfully shot a firearm at a dwelling house"; (2) that he "knew that the building was a dwelling house"; and (3) that this happened in New Mexico on or about July 5, 2016. *See* UJI 14-340 NMRA. We recently discussed the evidence sufficient to support a conviction of shooting at a dwelling in *State v. Comitz*, 2019-NMSC-011, 443 P.3d 1130.

**{18}** In *Comitz*, we held that the evidence was insufficient to support a conviction for shooting at a dwelling where the evidence did not support that the house was the target of the defendant's gunfire. *Id.* ¶¶ 18, 22 (citing *Webster's Third New International Dictionary* 136 (3d ed. 1993) (defining "at" as "a function word to indicate that which is the goal of an action or that toward which an action or motion is directed")). In that case, the defendant and his companions returned to a home four days after the defendant fought one of its residents. *Comitz*, 2019-NMSC-011, ¶¶ 2-3. After the defendant called for the resident to come outside, the resident came and stood on the porch steps with two others. *Id.* ¶¶ 4-5. An argument erupted into a gunfight in which one person was killed and two others were injured. *Id.* ¶¶ 6-8.

**{19}** We concluded that these facts were significantly distinguishable from opinions upholding convictions for shooting at a dwelling. *Id.* ¶¶ 19-22. First, the defendant's specific targeting of the individuals in front of the house was distinct from the indiscriminate firing at houses in previous cases. *Id.* ¶¶ 18-22; *see State v. Torrez* 2013-NMSC-034, ¶¶ 2-4, 42, 305 P.3d 944 (upholding a conviction for shooting at a dwelling where the defendant engaged in an altercation at the party, returned to the party, and fired at the house); *State v. Varela*, 1999-NMSC-045, ¶¶ 1-2, 4, 7, 21, 128 N.M. 454, 993 P.2d 1280 (upholding a conviction for accessory to felony murder by shooting at a dwelling where the defendant's companion fired several rounds into the mobile home of a gang rival's father to "get even" with the rival). Second, we noted the absence of testimony that the defendant had directly aimed at the house. *Comitz*, 2019-NMSC-011, ¶¶ 20, 22.

**{20}** In contrast to *Comitz*, in *State v. Arrendondo* we upheld a conviction for shooting at a dwelling where the evidence allowed the jury to reasonably infer that the defendant

"intentionally shot into the house." 2012-NMSC-013, ¶¶ 36-37, 278 P.3d 517. We based this conclusion on evidence that (1) the defendant "was expressing hostility towards" someone he knew was in the house; (2) "at least two bullets entered the house"; and (3) "the trajectory of the bullets that entered the house was different from the trajectory of the bullets that entered [the victim's] body[,]" indicating that the defendant "was aiming directly at the house." *Id.*

**{21}** In this case, no evidence was presented that Defendant directly targeted any dwelling or even a person in a dwelling. At closing and on appeal, the only evidence the State relies on to prove that Defendant "willfully shot at a dwelling" is testimony from the resident of 304 Peachtree that her home was hit and damaged by gunfire. Although crime scene investigators testified to the damage to 304 Peachtree, no trajectory evidence was presented to demonstrate that Defendant or Carlos directly aimed at the house. Additionally, no evidence was presented that Defendant had any hostility towards the residents of 304 Peachtree. Instead, the State argued at closing that "concentration of fire was not on anywhere else except that vehicle and on the white vehicle where . . . the two couples were when they left."

**{22}** Like in *Comitz*, the evidence in this case supports that Defendant and his companions fired at a group of people in front of houses, not at the houses themselves. 2019-NMSC-011, ¶ 18. Therefore, the evidence was insufficient to prove that the dwelling was the target of Defendant's gunfire and his conviction of shooting at a dwelling must be overturned. *See id.* ¶¶ 22-23.

## B. We Do Not Address Defendant's Double Jeopardy Claims

**{23}** Defendant argues that his convictions for both depraved mind murder and shooting at a dwelling subject him to double jeopardy, in violation of the Fifth and Fourteenth Amendments to the United States Constitution as well as Article II, Section 15 of the New Mexico Constitution. As a remedy, Defendant requests that we vacate his conviction for shooting at a dwelling. Because we vacate Defendant's conviction for shooting at a dwelling for a lack of sufficient evidence, we need not and do not address Defendant's double jeopardy claim. *Schlieter v. Carlos*, 1989-NMSC-037, ¶ 13, 108 N.M. 507, 775 P.2d 709 ("It is an enduring principle of constitutional jurisprudence that courts will avoid deciding constitutional questions unless required to do so. We have repeatedly declined to decide constitutional questions unless necessary to the disposition of the case.").

## C. Conspiracy to Commit Depraved Mind Murder Is Not an Offense and Defendant's Conviction is Vacated

**{24}** Defendant argues that his conviction for conspiracy to commit depraved mind murder should be vacated because it is a nonexistent crime. *State v. Baca*, 1997-NMSC-059, ¶ 53, 124 N.M. 333, 950 P.2d 776. Although this issue is not preserved, a conviction for a nonexistent crime is fundamental error which may be reversed on appeal without preservation. *State v. Maestas*, 2007-NMSC-001, ¶¶ 7, 26, 140 N.M.

836, 149 P.3d 933. The State concedes that conspiracy to commit depraved mind murder is a nonexistent crime, but requests that we remand for an entry of judgment for conspiracy to commit second-degree murder under the direct remand rule.

**{25}**    The direct remand rule allows this Court to remand for the entry of judgment on a lesser-included offense where the evidence supports that lesser-included offense and the jury was instructed on that lesser-included offense. *State v. Haynie*, 1994-NMSC-001, ¶ 4, 116 N.M. 746, 867 P.2d 416; *State v. Villa*, 2004-NMSC-031, ¶¶ 1, 9, 12-18, 136 N.M. 367, 98 P.3d 1017. Direct remand is appropriate when the interests of justice would not be served by a new trial on the lesser offense. *Villa*, 2004-NMSC-031, ¶ 9; *see State v. Garcia*, 1992-NMSC-048, ¶¶ 36-37, 114 N.M. 269, 837 P.2d 862 (reversing a conviction of first-degree murder and concluding that a new trial on second-degree murder and manslaughter would better serve the interests of justice than the entry of judgment on second-degree murder). The rationale behind the direct remand rule is that we may order judgment to be entered on the lesser-included offense because the jury necessarily found every essential element of the lesser-included offense by convicting on the greater offense. *Haynie*, 1994-NMSC-001, ¶ 4.

**{26}**    In this case, the jury was instructed on conspiracy to commit second-degree murder as a lesser-included offense of conspiracy to commit depraved mind murder. However, by convicting Defendant of conspiracy to commit depraved mind murder the jury did not by necessity find that he had the intent to kill and, therefore, the jury did not find all of the essential elements of conspiracy to commit second-degree murder. Accordingly, we vacate Defendant's conviction for conspiracy to commit depraved mind murder without remanding for an entry of judgment for conspiracy to commit second-degree murder.

**{27}**    Conspiracy is defined by Section 30-28-2(A) as "knowingly combining with another for the purpose of committing a felony within or without this state." In *Baca*, we recognized that conspiracy is a "paradigmatic specific intent offense[]" which "requires both an intent to agree and an intent to commit the offense which is the object of the conspiracy." 1997-NMSC-059, ¶ 51. We considered Section 30-28-2 to be consistent with the Model Penal Code, § 5.03(1), which requires that a person act "with the purpose of promoting or facilitating [the] commission" of a crime to be guilty of conspiracy to commit that crime. *Baca*, 1997-NMSC-059, ¶¶ 46-47, 52-53. Commentary to the Model Penal Code explains that conspiracy to commit a result crime, such as homicide, requires a purpose to bring about that result. *Model Penal Code and Commentaries*, § 5.03 cmt. 2, at 407-08 (1985). In *Baca*, we agreed that "when recklessness or negligence suffices for the actor's culpability with respect to a result element of a substantive crime, as for example when homicide through negligence is made criminal, there could not be a conspiracy to commit that crime." 1997-NMSC-059, ¶ 47 (quoting *Model Penal Code and Commentaries*, § 5.03 cmt. 2(c)(i), at 408). In other words, co-conspirators "cannot agree to accomplish a required specific result unintentionally." *Baca*, 1997-NMSC-059, ¶ 52 (quoting *State v. Beccia*, 505 A.2d 683, 684-85 (1986)). Because depraved mind murder is a "killing resulting from highly reckless behavior" which does not require an intent to kill, we held that conspiracy as

defined in New Mexico "does not encompass conspiracy to commit depraved-mind murder." *Baca*, 1997-NMSC-059, ¶¶ 51, 53.

**{28}**    Similar to depraved mind murder, second-degree murder punishes individuals who cause death by acts which they know create a substantial risk of harm to others. Section 30-2-1(B) (providing that to be guilty of second-degree murder a defendant must know that his or her acts "create a strong probability of death or great bodily harm to [an] individual"); *see generally State v. Candelaria*, 2019-NMSC-004, ¶¶ 9-14, 434 P.3d 297 (explaining the distinctions between depraved mind murder and second-degree murder). In certain circumstances, however, second-degree murder also punishes intentional killings. For instance, an unjustified, unprovoked, intentional killing is second-degree murder when it is committed "rashly or impulsively, rather than deliberately[.]" *State v. Tafoya*, 2012-NMSC-030, ¶ 37, 285 P.3d 604. We have recognized that the crime of "conspiracy to commit second degree murder [has] a mens rea requirement that the accused must intend to commit the crime." *State v. McDonald*, 2004-NMSC-033, ¶ 17, 136 N.M. 417, 99 P.3d 667. Under *Baca*, this requires that a defendant intend "to achieve [the] particular result" prohibited by Section 30-2-1(B), the death of another human being. *Baca*, 1997-NMSC-059, ¶ 46.

**{29}**    Remand for an entry of judgment for conspiracy to commit second-degree murder thus requires that the jury necessarily found that Defendant had the intent to kill when it found Defendant guilty of conspiracy to commit depraved mind murder. *See Haynie*, 1994-NMSC-001, ¶ 4. To find Defendant guilty of conspiracy to commit depraved mind murder, the jury was instructed that it had to find beyond a reasonable doubt that Defendant and another "agreed together to commit depraved mind murder" and "intended to commit depraved mind murder[.]" However, depraved mind murder does not require an intent to kill, and, by convicting Defendant of depraved mind murder, the jury instead found that he acted with the knowledge that his conduct was "greatly dangerous to the lives of others." UJI 14-203 NMRA. As such, the conspiracy to commit depraved mind murder instructions required the jury to find the internally inconsistent fact that Defendant agreed to unintentionally accomplish the result of the death of another human being. *See Baca*, 1997-NMSC-059, ¶ 52. By convicting Defendant of the nonexistent crime of conspiracy to commit depraved mind murder, the jury did not find that Defendant had the intent to achieve the result of the death of another and therefore did not find all of the essential elements of conspiracy to commit second-degree murder. For the foregoing reasons, we vacate Defendant's conviction for conspiracy to commit depraved mind murder and reject the State's request that we remand for the entry of judgment on conspiracy to commit second-degree murder.

**D.    The Lack of a Voluntary Intoxication Instruction Was Not Fundamental Error**

**{30}**    Defendant argues that the jury should have been instructed on voluntary intoxication because there is evidence in the record that he was very drunk around the time of the shooting. The State contends that the evidence in the record would not have entitled Defendant to a voluntary intoxication instruction and that, even if it did, the lack

of any such instruction was not fundamental error. We agree with the State that the lack of a voluntary intoxication instruction in this case did not result in fundamental error.

**{31}**     "[V]oluntary intoxication provides a defense to specific intent crimes where the intoxication is to such a degree as would negate the possibility of the necessary intent." *State v. Garcia*, 2011-NMSC-003, ¶ 35, 149 N.M. 185, 246 P.3d 1057 (internal quotation marks and citation omitted). Because it applies to specific intent crimes, voluntary intoxication can provide a defense to several of the crimes for which Defendant was convicted. *See* Section 30-3-5(A) (providing that aggravated battery includes an intent to injure); Section 30-22-5(A) (providing that tampering with evidence includes an "intent to prevent apprehension, prosecution, or conviction"); Section 30-28-2(A) (providing that conspiracy requires "the purpose of committing a felony"). We have held that voluntary intoxication can also provide a defense to the requirement of depraved mind murder that a defendant have " 'subjective knowledge' that his or her act was extremely dangerous to the lives of others." *State v. Brown*, 1996-NMSC-073, ¶¶ 16, 27, 122 N.M. 724, 931 P.2d 69 (citation omitted). Although voluntary intoxication applies to several of the charges against Defendant, he did not claim diminished capacity due to intoxication or request a voluntary intoxication instruction. We therefore review only for fundamental error. *State v. Barber*, 2004-NMSC-019, ¶¶ 7-8, 135 N.M. 621, 92 P.3d 633.

**{32}**     Fundamental error occurs when "a defendant's conviction shocks the conscience because either (1) the defendant is indisputably innocent, or (2) a mistake in the process makes a conviction fundamentally unfair notwithstanding the apparent guilt of the accused." *State v. Astorga*, 2015-NMSC-007, ¶ 14, 343 P.3d 1245 (internal quotation marks, alteration, and citation omitted). Our analysis for fundamental error in instructions begins, as with reversible error, with "whether a reasonable juror would have been confused or misdirected by the jury instruction." *Barber*, 2004-NMSC-019, ¶ 19. If there was error, we must "review the entire record, placing the jury instructions in the context of the individual facts and circumstances of the case, to determine whether the [d]efendant's conviction was the result of a plain miscarriage of justice." *Id.* (internal quotation marks and citation omitted).

**{33}**     Whether the lack of a voluntary intoxication instruction resulted in fundamental error in this case first depends on whether Defendant would have been entitled to a voluntary intoxication instruction had he requested one. *Id.* ¶ 9. A diminished capacity instruction is appropriate where the record contains evidence reasonably tending to show that a defendant's intoxication rendered that defendant incapable of forming the necessary mens rea. *State v. Begay*, 1998-NMSC-029, ¶ 38, 125 N.M. 541, 964 P.2d 102; *Arrendondo*, 2012-NMSC-013, ¶ 43. "In deciding whether the instruction is proper, the trial court must not weigh the evidence, but must simply determine whether such evidence exists." *State v. Privett*, 1986-NMSC-025, ¶ 20, 104 N.M. 79, 717 P.2d 55. Here, Defendant relies on the testimony of several witnesses who said he was drunk and described his behavior, such as falling over when he took a swing at Jesse, which Defendant argues is consistent with intoxication. However, given the circumstances of this case, it is unnecessary to determine whether this evidence would have entitled

Defendant to an intoxication instruction had he requested one. Even if we assume that Defendant would have been entitled to an intoxication instruction, he never claimed the defense of diminished capacity and the lack of a sua sponte intoxication instruction by the district court was not fundamental error.

**{34}** Defendant contends that the lack of an intoxication instruction was fundamental error because the district court has the obligation to "instruct the jury upon all questions of law essential for a conviction of any crime submitted to the jury." Rule 5-608(A) NMRA. We agree that "[t]he general rule is that fundamental error occurs when the trial court fails to instruct the jury on an essential element." *State v. Sutphin*, 2007-NMSC-045, ¶ 16, 142 N.M. 191, 164 P.3d 72. Moreover, when a defendant claims diminished capacity and advances evidence tending to show an incapacity to form the necessary intent, the ability to form the necessary intent becomes an essential element the State has the burden of proving. *State v. Balderama*, 2004-NMSC-008, ¶ 38, 135 N.M. 329, 88 P.3d 845; Use Note 1, UJI 14-5110 NMRA (1997) (providing that when the defendant has relied on the defense of diminished capacity, the ability to form the necessary intent is added to the essential elements of the offense); Use Note 1, UJI 14-5111 NMRA (1997) (same). However, Defendant made no arguments regarding his intoxication and never claimed that his intoxication interfered with his ability to form the mens rea necessary for depraved mind murder or the specific intent offenses. In other words, Defendant never raised the defense of diminished capacity and the State did not gain the burden of proving that Defendant was capable of forming the necessary mens rea. *Cf. State v. Sosa*, 1997-NMSC-032, ¶ 26, 123 N.M. 564, 943 P.2d 1017 ("[W]here a defendant raises the defense of self-defense, unlawfulness becomes a necessary element of the crime charged. Once the defendant claims that the conduct in question was lawful, the prosecution must prove unlawfulness beyond a reasonable doubt." (citations omitted)).

**{35}** That the district court did not sua sponte instruct the jury on the defense of diminished capacity where Defendant made no claim that he was intoxicated to the point he could not form the requisite mens rea does not shock our conscience. Contrary to Defendant's assertion, the lack of a voluntary intoxication instruction in this case does not implicate "a fundamental unfairness within the system that would undermine judicial integrity if left unchecked" and therefore did not result in fundamental error. *Barber*, 2004-NMSC-019, ¶ 18 (internal quotation marks and citation omitted).

**E.    The District Court Did Not Violate Defendant's Right to Confrontation by Limiting His Cross-Examinations of Janell and Abraham**

**{36}** Defendant argues that the district court abused its discretion and violated his right to confront the witnesses against him under the Confrontation Clause of the Sixth Amendment to the United States Constitution[1] by limiting his cross-examinations of Janell and Abraham. Because Janell and Abraham were the only witnesses who

---

[1] Defendant cites Article II, Section 14 of the New Mexico Constitution but makes no argument that it provides greater protection than the United States Constitution. We therefore limit our review to the Sixth Amendment. *See State v. Rivera*, 2008-NMSC-056, ¶ 11 n.1, 192 P.3d 1213.

identified Defendant as one of the shooters, Defendant contends that they were key witnesses for the State's case. Defendant specifically argues that, by limiting his questions regarding Janell's intoxication and Abraham's plea agreement, the district court improperly limited his ability to impeach their credibility.

**{37}** "Generally, the district court has broad discretion to control the scope of cross-examination, including the discretion to control cross-examination to ensure a fair and efficient trial." *State v. Samora*, 2016-NMSC-031, ¶ 43, 387 P.3d 230 (internal quotation marks and citation omitted). As such, we normally review a district court's limitations on cross-examination for an abuse of discretion. *State v. Brown*, 1997-NMSC-029, ¶ 18, 123 N.M. 413, 941 P.2d 494. A trial court abuses its discretion when its "ruling is clearly against the logic and effect of the facts and circumstances of the case" and is "clearly untenable or not justified by reason." *Samora*, 2016-NMSC-031, ¶ 37. However, we review de novo the issue of whether those limitations violated a defendant's right to confront witnesses. *Id.* ¶ 48.

**{38}** A defendant's right to confront the witnesses against him or her is guaranteed by the Confrontation Clause of the Sixth Amendment. "The most important element of the right of confrontation is the right of cross-examination." *State v. Sanders*, 1994-NMSC-043, ¶ 22, 117 N.M. 452, 872 P.2d 870. It is primarily through cross-examination that a defendant is able to test the truth and credibility of adverse witnesses. *Id.* However, a district court has "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* ¶ 23 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). "Only when cross-examination is unduly restricted does constitutional error result." *State v. Smith*, 2001-NMSC-004, ¶ 19, 130 N.M. 117, 19 P.3d 254.

**{39}** Although Defendant raises Confrontation Clause arguments on appeal, he failed to preserve those arguments below. Defendant's claim involves the district court's decisions to sustain several objections by the State during the cross-examinations of Janell and Abraham. Defense counsel accepted each of the district court's decisions and made no arguments regarding Defendant's right to confront witnesses. As such, a ruling by the district court on Defendant's Confrontation Clause rights was not fairly invoked and the issue was not preserved for review. Rule 12-321(A) NMRA ("To preserve an issue for review, it must appear that a ruling or decision by the trial court was fairly invoked."). We therefore review this issue only for fundamental error. *State v. Silva*, 2008-NMSC-051, ¶¶ 9-11, 144 N.M. 815, 192 P.3d 1192. As discussed, under fundamental error review, we first consider whether there was any error and, if so, whether that error resulted in a "miscarriage of justice." *Id.* ¶¶ 11, 13 (internal quotation marks and citation omitted).

**{40}** With these principles in mind, we turn to discuss Defendant's arguments that the district court erred by limiting his cross-examination of Janell and Abraham. For the following reasons, we conclude that none of the district court's limitations on

Defendant's cross-examination were an abuse of discretion or a violation Defendant's right to confrontation. Accordingly, we deny Defendant's request for a new trial on these grounds.

**1. Janell**

**{41}** On direct examination, Janell testified that on July 4 she smoked methamphetamine in the early afternoon and drank seven beers throughout the day. On cross-examination, she stated that after the shooting she told the police a slightly different story[2] than her trial testimony because she was "buzzing." Defense counsel asked Janell whether she felt that she was too intoxicated to drive and the State objected on relevance. Defense counsel explained that he was trying to establish the extent of her impairment. The district court sustained the objection but allowed defense counsel to rephrase his question.

**{42}** Defense counsel then confirmed that Janell was not thinking straight and asked her whether that impairment would have affected her powers of observation. The State objected on foundation grounds and the court sustained the objection. Again, the district court allowed defense counsel to rephrase the question. In response to the next several questions, Janell explained that she was "buzzed" but not drunk because she could still walk and knew what had happened. Because Janell denied being falling-down drunk, Defense counsel asked if that meant she had lied to police. Janell initially denied being untruthful but eventually answered that she was not truthful because she was buzzed. Defense counsel pushed against this answer, stating that someone could be buzzed but still truthful and began asking Janell why she had lied. The State objected to the question as argumentative, and the district court sustained.

**{43}** Defendant argues that these limitations on his cross-examination prevented him from effectively inquiring into the extent of Janell's intoxication and the effects of that intoxication on her powers of observation. Defendant is correct that the credibility of a witness is a relevant and proper inquiry in cross-examination. Rule 11-611(B) NMRA; *State v. Johnson*, 2010-NMSC-016, ¶ 41, 148 N.M. 50, 229 P.3d 523 ("Evidence that reflects on a witness' credibility is relevant."). While defense counsel's specific questions were arguably directed towards the extent and effect of Janell's impairment, the district court did not prevent Defendant from inquiring further regarding that impairment. Rather, the district court allowed defense counsel to reformulate his questions and, in fact, he was able to elicit testimony that she was "buzzed" but not drunk and was aware of what happened. Defense counsel was then able to question whether, if she was not falling-down drunk, that meant she had lied to police. Because Defendant was permitted to impeach Janell's credibility, including as to the extent and effect of her impairment, we conclude that the district court did not abuse its discretion by sustaining the State's objections to defense counsel's particular questions. *See*

---

[2]Despite this question, defense counsel never asked her about specific inconsistencies between her statement to police and her trial testimony. On cross-examination Janell agreed that she told police a slightly different story but on re-direct Janell claimed that she was truthful with the police and that she did not know what was inconsistent between her statement to police and her trial testimony.

*Samora*, 2016-NMSC-031, ¶ 37 ("We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." (internal quotation marks and citation omitted)).

**{44}** Likewise, we are not convinced that the limitations on Defendant's cross-examination of Janell violated his Confrontation Clause rights. We have recognized that a violation of the Confrontation Clause occurs where "defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Id.* ¶ 49 (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)); *see also Sanders*, 1994-NMSC-043, ¶ 26 ("[The] test for Confrontation Clause violation[s] is whether [a] reasonable jury might have received [a] significantly different impression of the witness's credibility had counsel pursued [the] proposed line of cross-examination." (citing *Van Arsdall*, 475 U.S. at 680)). Here, Defendant was not prevented from exposing the jury to testimony regarding Janell's impairment at the time of the shooting and the jury could have drawn inferences regarding the credibility of her account. Therefore, the limitations on Defendant's cross-examination was not a violation of the Confrontation Clause, let alone a "miscarriage of justice." *Silva*, 2008-NMSC-051, ¶¶ 13-15 (internal quotation marks and citation omitted) (holding that there was no fundamental error where the defendant was not permitted to ask whether a witness received immunity in exchange for his testimony but was nevertheless able to effectively cross-examine the witness).

## 2.    Abraham

**{45}** On direct examination, Abraham testified that he did not see a shotgun in Defendant's hands until Defendant started shooting. On cross-examination, defense counsel asked him about this testimony, confirming that Defendant had been in the front of the truck with Abraham and was not wearing a large coat. Defense counsel then asked Abraham, "Can you explain to us how you did not see a shotgun?" The district court sustained the State's objection that this question called for Abraham to speculate. Defense counsel continued, "You saw the shotgun, didn't you?" The district court sustained an objection to this question as argumentative.

**{46}** Abraham also testified on direct examination that he had taken a plea agreement regarding his involvement in the shooting. On cross-examination, Abraham confirmed that part of this plea agreement included testifying. Defense counsel then asked if that included testifying against his cousin, Carlos, and the State objected on relevance. The district court sustained the objection.

**{47}** First, Defendant contends that the questions regarding why Abraham did not see the shotgun were reasonably related to Abraham's ability to observe, which is an important part of a witness's credibility. *See* UJI 14-5020 NMRA (instructing the jury to consider, among other things, a witness's "ability and opportunity to observe"). Defendant argues that questioning Abraham's claim that he did not see the gun until they got to Peachtree Street would have allowed him to generally cast doubt on the

credibility of Abraham's account of the events. However, as with Janell's intoxication, Defendant was permitted to question Abraham's claim that he did not initially see the shotgun. Defendant was able to confirm that Defendant was sitting in the front seat next to Abraham and was not wearing a large coat that could have concealed the weapon. Defense counsel then asked Abraham how he *might* not have seen the weapon. Given these circumstances, the district court's ruling that this question asked for Abraham to speculate was not "clearly untenable" or unreasonable. *Samora*, 2016-NMSC-031, ¶ 37 (internal quotation marks and citation omitted). Moreover, because Defendant was able to cross-examine Abraham on his claim that he did not initially see the shotgun, it is unclear how a "reasonable jury might have received [a] significantly different impression" of Abraham's credibility had Defendant been able to ask Abraham to explain why he did not see the shotgun. *Sanders*, 1994-NMSC-043, ¶ 26. Accordingly, the district court's ruling was neither an abuse of discretion nor a violation of the Confrontation Clause.

{48}   Second, Defendant argues that he was prevented "from fully exploring the terms of Abraham's plea agreement" and Abraham's bias towards portraying Defendant as the most culpable between Defendant, Abraham, and Carlos. Defendant correctly notes that a witness's bias or prejudice is important to impeaching the witness's credibility. *See State v. Meadors*, 1995-NMSC-073, ¶ 30, 121 N.M. 38, 908 P.2d 731 (recognizing witness bias as "a classic ground for impeachment"); *United States v. Abel*, 469 U.S. 45, 52 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.") As with his other claims, Defendant was not prevented from questioning Abraham about his plea agreement and whether it included testifying against Defendant. The district court only limited questions about whether the agreement included testifying against Carlos. On appeal, Defendant argues that, had the jury heard that Abraham agreed to testify against Carlos, they may have doubted Abraham's testimony portraying himself and Carlos as participants and Defendant as the "mastermind" of the shooting. However, defense counsel made no such argument before the district court. Defendant was allowed to question Abraham on his plea agreement, tending to show his bias towards pointing the finger at Defendant, and there was no indication below of how Abraham's agreement to testify against Carlos was independently relevant to Abraham's bias against Defendant.

{49}   On appeal, Defendant contends that whether he was the instigator of the shooting or a mere participant was relevant to the jury's distinction between first-degree depraved mind murder and second-degree murder. As Defendant argues, the jury may have convicted him of second-degree murder had they viewed him as having a "more limited role in the shooting." We are not persuaded. A person may be guilty of depraved mind murder even as an accomplice and, as the State points out, the jury in this case was indeed instructed on accomplice liability. *See Baca*, 1997-NMSC-059, ¶¶ 18-22 (affirming a conviction for depraved mind murder on an accomplice theory). Therefore, regardless of whether Defendant was the instigator or a participant in the shooting, he could be guilty of depraved mind murder. Defendant fails to convince this Court that being a participant rather than the instigator of the shooting is relevant to any of the

distinctions between depraved mind murder and second-degree murder. *See Candelaria*, 2019-NMSC-004, ¶ 10 (noting that the depraved mind murder is distinguished from second-degree murder by four factors: "(1) more than one person was endangered by the defendant's act, (2) the defendant's act was intentional and extremely reckless, (3) the defendant had subjective knowledge that his act was greatly dangerous to the lives of others, and (4) the defendant's act encompassed an intensified malice or evil intent" (internal quotation marks, alterations, and citation omitted)). As long as Defendant acted with the requisite mens rea for depraved mind murder, it is irrelevant whether he was the "mastermind," a participant, or even an accomplice. *See State v. Carrasco*, 1997-NMSC-047, ¶ 7, 124 N.M. 64, 946 P.2d 1075 ("[A]n accessory must share the criminal intent of the principal.").

**{50}** For these reasons, the district court's decision to sustain the State's objection to Defendant's question was not "clearly untenable or not justified by reason." *Samora*, 2016-NMSC-031, ¶ 37 (internal quotation marks and citation omitted). Moreover, this limitation on the cross-examination of Abraham did not violate Defendant's constitutional rights. Abraham admitted on direct examination that he had taken a plea deal and Defendant was allowed to question him about whether that plea deal included testifying. The jury was already aware that Abraham had a bias towards portraying Defendant in a more culpable light than himself. Had the jury also heard that Abraham had agreed to testify against Carlos, his cousin, they would not have received a "significantly different impression of [Abraham's] credibility." *Sanders*, 1994-NMSC-043, ¶ 26.

**{51}** We reject Defendant's arguments that the limitations on the cross-examinations of Janell and Abraham were an abuse of discretion or a violation of his right to confrontation and deny Defendant's request for a new trial on these grounds.

### F.    Defendant's Judgment and Sentence Must Be Corrected to Reflect the Jury's Verdict

**{52}** The judgment and sentence issued by the district court indicate that Defendant was convicted of first-degree willful and deliberate murder and conspiracy to commit first-degree willful and deliberate murder. This is incorrect, as the jury convicted Defendant of first-degree depraved mind murder and conspiracy to commit first-degree depraved mind murder. Both Defendant and the State agree that this is a clerical error which may be corrected at any time under Rule 5-113(B) NMRA. On remand, we instruct the district court to correct the judgment and sentence to reflect the jury's guilty verdict for first-degree depraved mind murder on Count 1.

## II.    CONCLUSION

**{53}** For the foregoing reasons we deny Defendant's requests for a new trial on the grounds of either the lack of an intoxication instruction or the alleged errors in the district court's limitations on his cross-examination of witnesses. We remand to the district court to: (1) vacate Defendant's convictions for tampering with the evidence and shooting at a

dwelling for insufficient evidence; (2) vacate Defendant's conviction for conspiracy to commit depraved mind murder because it is a nonexistent crime; and (3) correct Defendant's judgment and sentence to properly reflect the jury's verdict.

**{54}   IT IS SO ORDERED.**

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

**JUDITH K. NAKAMURA, Chief Justice**

**MICHAEL E. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice**